**A. JOHNSON & CO., INC., and A. Johnson Energy Marketing, Inc., Plaintiffs, Appellants,**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Defendant, Appellee.**

No. 90–1753.

United States Court of Appeals, First Circuit.

Heard Dec. 6, 1990.

Decided May 14, 1991.

Robert L. Ciociola with whom Mary–Jo McNamara and Weiss, Angoff, Coltin & Koski, P.C., Boston, Mass., were on brief, for plaintiffs, appellants.

John P. Graceffa with whom Gallagher & Gallagher, P.C., Boston, Mass., was on brief, for defendant, appellee.

Sharon Rau Dissinger, Thomas W. Brunner, Laura A. Foggan, Francis M. Gaffney and Wiley, Rein & Fielding, Washington, D.C., on brief, for Ins. Environmental Litigation Ass'n, amicus curiae.

Before CAMPBELL, Circuit Judge, COFFIN, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Plaintiffs-appellants A. Johnson & Co., Inc. and its subsidiary, A. Johnson Energy Marketing, Inc. (together, "Johnson") brought this diversity action seeking a declaration of rights under comprehensive general liability insurance policies provided by the Aetna Casualty and Surety Company ("Aetna") to Johnson's corporate predecessors,[1] Atlantic Terminal Corporation ("Atlantic") and Titan Petroleum Company, Inc. ("Titan"). Johnson seeks a declaration that Aetna was required to defend and indemnify it with respect to certain costs relating to the "McKin" hazardous waste site near Gray, Maine. On cross-motions for summary judgment, the district court, applying Maine law,[2] ruled in favor of Aetna, holding that Aetna had no obligation under the insurance policies to defend or indemnify Johnson in connection with the McKin site.[3] Johnson appeals. We affirm.

### Background

Between 1965 and 1978, Richard Dingwell, doing business as the McKin Company, operated a tank cleaning and waste disposal facility near Gray, Maine. Johnson's corporate predecessors, among others, including Atlantic and Titan, generated hazardous wastes in New Hampshire which were disposed of at the McKin site from November, 1974 to September, 1976. The United States Environmental Protection Agency ("EPA") and the Maine Department of Environmental Protection ("DEP") alleged that hazardous wastes which were disposed of at the McKin site contaminated the underlying groundwater, which resulted in contamination of the Gray, Maine water supply system. In 1978, DEP ordered that the McKin site be closed.

In a letter dated November 8, 1985, DEP notified Johnson that it was designating the McKin site an Uncontrolled Hazardous Substance Site pursuant to 38 Me.Rev.Stat. Ann. §§ 1361–1370. Johnson's predecessors, C.H. Sprague and Son Company ("Sprague") and Atlantic, were included among those who allegedly "arranged for the handling or transport of a pollutant which arrived at the Site and which has been discharged to ground water or other waters of the State," and were thereby designated potentially responsible parties

---

1. Johnson alleges that it is the successor to C.H. Sprague and Son Company, Atlantic Terminal Sales Corporation, Atlantic Terminal Corporation, ATC Petroleum, Inc. and Titan Petroleum Company, Inc. While Aetna does not concede this point, no issue on that score is presented on appeal.

2. The parties acknowledge on appeal that Maine law is applicable.

3. *A. Johnson & Co., Inc. v. Aetna Casualty & Surety Co.,* 741 F.Supp. 298 (D.Mass.1990).

("PRPs") pursuant to 38 Me.Rev.Stat.Ann. §§ 1365, 1362.[4] In all, DEP noted that, according to the McKin Company, "more than 300 parties arranged ... for the handling, treatment or disposal of petroleum or industrial chemical wastes or both at the Site since 1965." DEP explained that, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, a Remedial Investigation and Feasibility Study ("RI/FS") had been completed and approved by EPA, and that DEP and EPA were "in the process of completing final abatement and clean-up plans for the Site." The letter also discussed, in some detail, the circumstances of the site's use as a tank cleaning and waste removal business from approximately 1965 to 1978, and the analyses detecting contamination at the site. *See infra.*

In a letter dated April 15, 1986, EPA issued a similar letter identifying Titan as a PRP at the McKin site under CERCLA. EPA advised that, under CERCLA §§ 106(a) and 107(a), responsible parties may be ordered to clean up the site, or may be liable for government expenditures in responding to the site contamination. EPA encouraged Johnson "to undertake voluntary cleanup activities" and stated that, prior to undertaking further remedial activities, "we wish to discuss your voluntary participation, either independently or in concert with other [PRPs], in the measures necessary to remedy the remaining problems presented by the hazardous substances at the site." Finally, the EPA letter, under authority of Section 3007 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6927, and Section 104 of CERCLA, 42 U.S.C. § 9604, included extensive document requests relating to wastes disposed of at the McKin site.

After learning that it, by virtue of its predecessors' actions, was a PRP, Johnson joined with a number of other PRPs in a site steering committee to negotiate with DEP and EPA to clean up the site. Negotiations between the governmental entities and the PRPs continued for some time. On May 5, 1988, DEP and EPA filed a complaint in the United States District Court for the District of Maine seeking injunctive relief to abate and remedy the contamination, as well as recovery of response costs which EPA and DEP had incurred at the site. The complaint did not specifically seek "natural resource damages." Aetna asserts, and Johnson does not contest, that this complaint was filed only as a prerequisite to the entry of a Consent Decree on November 2, 1988. This Consent Decree, entered into between EPA and DEP and various PRPs including Johnson, provided for payment of cleanup and oversight costs at the McKin site. Under the Consent Decree, the settling parties paid $3 million to the United States and Maine in settlement of their claims. Johnson was liable for $515,895.51. The Consent Decree contained a covenant by EPA and DEP not to sue for "natural resource damages arising out of the conditions at or originating from the McKin Site." Johnson asserts its total defense costs were $117,107.67.

Independent of response costs, Johnson also paid $271.03 as its share of $6,391.00 needed to repay certain residents of Gray, Maine for the extension of the public water line to their home (the "Humphrey settlement"). According to a July 17, 1986 letter from Roy Hutson (the McKin Site Escrow Account Representative), to the account contributors, EPA's first proposed January 24, 1986 Consent Decree provided that the settling parties' scope of work would include extension of the public water supply to Gray residents in the McKin site area not already provided with public water. Through negotiation with EPA and DEP, the Steering Committee agreed that the Settling Parties would pay for connection of the single residence needing hookup to the public water line in exchange for dele-

4.  DEP also listed a separate group of parties as owners or operators of the site or those who had arranged for transport or handling of hazardous substances which arrived at the site, who were thereby identified as "responsible parties" pursuant to 38 Me.Rev.Stat.Ann. § 1362(2). DEP advised that it was investigating whether those listed as PRPs should be added to those listed as responsible parties by virtue of the hazardous nature of their wastes.

tion of any mention of the water line from the Consent Decree.

At issue in this case are Johnson's predecessors' insurance policies. Aetna issued comprehensive general liability ("CGL") insurance policies to Titan for the period from June 8, 1973 through June 8, 1975 and to Atlantic for the period from June 8, 1975 through June 8, 1978, in the amount of $1,000,000.00 per occurrence and in the aggregate, for property damage which occurred during the policy period. Under each of these policies, Aetna agreed to defend the insured against any suit seeking damages arising out of occurrences covered under the policy and agreed to pay any such damages for which the insured might become legally obligated. In addition, each policy included a "pollution exclusion" excluding damages resulting from pollution except where such pollution is "sudden and accidental." [5] Upon learning that DEP and EPA had identified Johnson's predecessors as PRPs, Johnson, by letter dated January 31, 1986, instructed Pilot Insurance Agency, its former broker, to notify Aetna and to demand that Aetna defend and indemnify Johnson in connection with the McKin proceedings.

■ The district court properly determined, (and the parties do not dispute), that under Maine law, Aetna's obligation to pay on behalf of Johnson "damages because of ... property damage" does not extend to administrative or cleanup costs, which are equitable in nature and do not constitute "damages" within the meaning of CGL insurance. 741 F.Supp. at 303 (*citing Patrons Oxford Mutual Insurance Co. v. Marois*, 573 A.2d 16, 17 (Me.1990)). Based largely on the affidavit of Lawrence C. Winger (the "Winger affidavit"), counsel to Johnson in this matter, the district court concluded that Johnson's total McKin site contributions included only uninsured cleanup and administrative expenses and did not include natural resource or property damages, other than the *de minimis* sum paid in the Humphrey settlement. *Id.* at 304.

Because Aetna's policies included no deductible, however, the district court thereafter went on to determine that Aetna was not obliged to indemnify Johnson for the *de minimis* Humphrey settlement amount because that liability falls within the policies' "pollution exclusion." The court held that Johnson failed to establish that it could meet its burden to show that the occurrence giving rise to the Humphrey settlement came within the "sudden and accidental" exception to the pollution exclusion.

**5.** Each Aetna policy contained the following provisions:
I. Coverage A—Bodily Injury
Coverage B—Property Damage Liability
The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
A. bodily injury or
B. property damage
to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
Each Aetna policy defined "occurrence" and "property damage" as follows:
"Occurrence" means an accident, including continuous or repeated exposure to condi-

tions, which results in bodily injury or property damage neither expected or intended from the standpoint of the insured.
"Property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
Each Aetna policy contained the following "pollution exclusion" provision:
This policy does not apply:
(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Rather, the district court concluded that there were neither allegations nor evidence in the record sufficient to come within the "sudden and accidental" exception. *Id.* at 304–05.

Finally, the district court held that Aetna had no duty to defend Johnson in connection with the McKin proceedings. The court relied upon the Maine Supreme Judicial Court's holding that there is no duty to defend where there has been no suit against the insured seeking damages. *Marois,* 573 A.2d at 20. The court rejected Johnson's contention that the duty to defend was triggered by its receipt of administrative notices designating it a PRP and concluded that because "[t]he only complaint filed to date, that of the United States and the State of Maine, makes no claim for natural resource damages.... no duty to defend has yet been triggered." *Id.* at 306.

On appeal, Johnson contends that the letters from DEP and EPA identifying Johnson as a PRP triggered Aetna's duty to defend. Johnson argues that, contrary to the district court's finding, the United States and Maine asserted claims in those letters for natural resource damages, under CERCLA, 42 U.S.C. § 9607(a)(C) (1980), and subsequently reasserted those claims in their complaint. Johnson also maintains that sums paid to the United States and Maine under the Consent Decree represented, at least in part, natural resource damages and that the Humphrey settlement, at least, constituted property damages indemnifiable under the Aetna policies.

■ We need not reach the question of whether the duty to defend may be triggered by something short of a formal lawsuit, such as the federal PRP letter and letter from Maine DEP in this case. The highest court in Maine has not addressed this complex issue, and other courts are divided. *See Ryan v. Royal Insurance Co. of America,* 916 F.2d 731, 738 (1st Cir. 1990) (discussing contours of duty to defend and citing cases). Neither need we decide whether DEP and EPA ever asserted claims for—or whether Johnson ever paid—damages, under CERCLA, 42 U.S.C.

§ 9607(a)(C), or otherwise. Rather, we find it sufficient to affirm the district court's decision that presuming, *arguendo,* that the PRP letters in this case were functionally equivalent to a lawsuit for purposes of the duty to defend, Aetna still was not obligated either to defend or indemnify Johnson because—based on the allegations in the PRP letters—the "pollution exclusion" provisions of the Aetna policies preclude coverage.

### Discussion

Our review of the district court's grant of summary judgment is plenary, and we view all the evidence (such as the PRP letters) in the light most favorable to the non-movant Johnson. Fed.R.Civ.P. 56; *Muller Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico,* 929 F.2d 814 (1st Cir.1991); *Olivera v. Nestle Puerto Rico, Inc.,* 922 F.2d 43, 44–45 (1st Cir. 1990).

### I.

In *The Travelers Indemnity Company v. Dingwell,* 414 A.2d 220 (Me.1980), the Maine Supreme Judicial Court (hereinafter "Maine SJC") considered insurers' duty to defend under primary CGL insurance policies issued to Dingwell, the operator of the McKin site. *Dingwell* is of particular relevance to our inquiry, not merely because it concerned the same site, but more importantly because the Maine SJC extensively discussed the duty to defend under insurance policies containing "pollution exclusion" provisions virtually identical to those in Aetna's policies at issue here. In that case, Dingwell's three insurers sought a declaration that they were not obliged to defend or indemnify Dingwell in a class action lawsuit brought by residents of the Town of Gray, Maine, to recover damages for contamination of their well water resulting from the contamination at the McKin site. The Maine SJC explained that an insurer's duty to defend is properly determined through a "comparison test," in which the insurance policy is laid alongside the underlying damage complaints to determine whether the pleadings are adequate

to encompass an occurrence within the coverage of the policy. *Dingwell,* 414 A.2d at 224 (*citing American Policyholders Insurance Company v. Cumberland Cold Storage Company,* 373 A.2d 247, 249 (Me. 1977)). The Court also noted:

> [T]he pleading test for determination of the duty to defend is based exclusively on the facts as alleged rather than on the facts as they actually are. "[T]he duty to defend is broader than the duty to pay or indemnify ... [T]he duty to indemnify, i.e., ultimate liability, depends ... upon the true facts."

*Id.* (*quoting Cumberland Cold Storage,* 373 A.2d at 249–50) (citations omitted).

In *Dingwell,* as in this case, the insurance policies extended coverage to property damage caused by an "occurrence," where "occurrence" was defined as "an accident, including continuous or repeated exposure to conditions, which results in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured." 414 A.2d at 223; *see supra* note 5. Also, two of the insurers' policies contained "pollution exclusion" clauses and an exception to the "pollution exclusion" where the "discharge, dispersal, release or escape is sudden and accidental," using identical language to the Aetna policies at issue here.[6] The insurers argued that the pollution exclusion provisions relieved them of any duty to defend the class action. The Court held, however, that a count[7] alleging that the contamina-

tion resulted from Dingwell's negligence generated a duty to defend, "because it discloses a potential for liability within the coverage and contains no allegation of facts which would necessarily exclude coverage."[8]

In applying the "comparison test" in *Dingwell,* the Maine SJC determined that the Superior Court erred in relying on the allegations that contaminants "permeated the ground" and "spread in the water table" to contradict claims that the pollution was "sudden and accidental." Rather, the court held: "The behavior of the pollutants in the environment, after release, is irrelevant to these provisions." The court also rejected the insurers' contention that no duty to defend arises unless the complaint alleges specific facts which, if proved, (such as a "sudden and accidental" release), would bring the action within the insurance coverage. Rather, taking account of the "reality of modern pleading"— in which plaintiffs are not required to allege every fact ultimately to be proven but may make broad conclusory allegations— the court stated:

> "Precision" is not required in the complaint, and it is not necessary for determining a duty to defend. The correct test is whether a potential for liability within the coverage appears from whatever allegations are made.... A defendant has no power to amend a complaint which contains an incomplete statement

---

**6.** The third insurer, the Travelers, included a "pollution exclusion" applicable if the pollution is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable...." The Maine SJC distinguished this language from the "sudden and accidental" exception in the other policies. *See infra.*

**7.** Dingwell conceded that counts of the class action complaint alleging intentional acts did not give rise to the duty to defend.

**8.** The Maine Supreme Judicial Court quoted the following from the complaint at issue in *Dingwell:*

> 9. That among the products processed by the Defendants or utilized in the business of the Defendant are products containing or producing the chemicals trichloromethane, trichloroethylene, and dimethylsulfide....

> 14. That as a result of negligence on the part of the Defendant ... products containing the aforesaid chemicals permeated the ground to the ground water table to the properties of the Plaintiffs resulting in the contamination of water in the Plaintiffs' wells....

> 15. That in addition, the aforesaid contaminants have spread in the water table to lands surrounding the Defendant's processing facility to a radial distance of at least one mile and have contaminated at least one major surface watercourse (Collyer Brook) which flows into the Royal River thereby contaminating water present on properties in which members of the class have legal interest.

*Dingwell,* 414 A.2d at 224. The Court emphasized that the complaint did "not include specific factual allegations." *Id.* at 226.

of facts. Whether he can obtain a defense from his insurer must depend not on the caprice of the plaintiff's draftsmanship, nor the limits of his knowledge, but on a potential shown in the complaint that the facts ultimately proved may come within the coverage. Even a complaint which is legally insufficient to withstand a motion to dismiss gives rise to a duty to defend if it shows an intent to state a claim within the insurance coverage.

*Dingwell,* 414 A.2d at 226 (citations omitted).

In this case, we presume, *arguendo,* that the PRP letters were the functional equivalent of a suit sufficient to trigger the duty to defend. Nevertheless, applying the "comparison test" to the allegations contained in the Maine DEP PRP letter and the Aetna policies' pollution exclusion provision, we find that Aetna had no duty to defend Johnson. It is of no moment that the Maine Supreme Judicial Court, in *Dingwell,* found in 1980 that Dingwell's insurers had a duty to defend where the underlying complaint included only a broad, conclusory allegation of negligence. Here, unlike in *Dingwell,* the PRP letters contained factual details which were totally inconsistent with any view that the pollution at the McKin site was "sudden and accidental."

## II.

■ Before proceeding to the factual allegations in the Maine DEP PRP letter, we first consider the precise meaning of the "sudden and accidental" exception to the "pollution exclusion." We keep in mind the Maine SJC's directive in *Dingwell, supra,* that only the initial release is relevant to the "sudden and accidental" inquiry (not the behavior of the pollutants in the environment after the initial release).[9] The Maine Supreme Judicial Court has not definitively construed the "sudden and accidental" language. Johnson, noting that jurisdictions have split over this construction, contends that the language is ambiguous. Johnson urges, therefore, that Maine would—construing ambiguous terms against the insurer—accord the term "sudden" its less restrictive meaning of "unexpected, taking into account the expectation of the insured," rather than its temporal meaning of "abrupt." We disagree.

■ We think that Maine will likely join the jurisdictions which accord "sudden" its unambiguous, plain and commonly accepted meaning of temporally abrupt. *See Peerless Insurance Co. v. Brennon,* 564 A.2d 383, 384 (Me.1989) ("The court must interpret unambiguous language in a contract according to its plainly and commonly accepted meaning."). Under Maine law, ambiguity of language in an insurance policy is to be evaluated from the standpoint of an " 'ordinarily intelligent insured,' engaged in a 'more than casual reading of the policy,' " *Marois,* 573 A.2d at 18 (quoting *Union Mutual Fire Insurance Co. v. Commercial Union Insurance Co.,* 521

**9.** This focus on the actual discharge of the pollutants for purposes of the "pollution exclusion" is in marked contrast to an inquiry regarding whether there was an "occurrence" to which coverage extends, within the meaning of the insurance contract. The term "occurrence" only covers accidents which result in "property damage neither expected or intended from the standpoint of the insured." *See supra,* note 5. Thus, the "occurrence" provision focuses on the property damage after the initial discharge, and whether it was expected or intended from the insured's point of view. *See Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.,* 555 N.E.2d 568, 571, 407 Mass. 675 (1990). The "sudden and accidental" language, unlike the "occurrence" definition, does not by its terms take account of an insured's status as a passive polluter (as in the case of Johnson here). *See Fireman's Fund Insurance Co. v. Ex–Cell–O*

*Corp.,* 702 F.Supp. 1317, 1325 (E.D.Mich.1988) ("If ... the term ['active polluter' imports some additional criteria not found in the policy, it is not part of the parties' contract."); *Outboard Marine Corp. v. Liberty Mutual Insurance Corp.,* 212 Ill.App.3d 231, 246, 156 Ill.Dec. 432, 441, 570 N.E.2d 1154, 1163 (Ill.App.2d Dist.1991); ("Since [an "active polluter"] criterion is not mentioned in the pollution exclusion or any other portion of the applicable policies, it is irrelevant in determining whether the exclusion applies."); *West American Insurance Co. v. Baumgartner,* 1990 WESTLAW 210671, *1, —— Colo.App. ——, ——, 812 P.2d 696, 698 (Colo. App. Dec. 20, 1990) ("We also disagree with [the insured's] contention that this pollution exclusion clause applies only to active, deliberate polluters. Having determined that the policy is not ambiguous, we must apply it as written.").

A.2d 308, 310 (1987)); *Great Lakes Container Corp. v. National Union Fire Insurance Co.*, 727 F.2d 30, 34 (1st Cir.1984) (applying New York law). We agree with the district court that Maine would likely concur in the recent Massachusetts conclusion that "[i]f the word 'sudden' is to have any meaning or value in the exception to the pollution exclusion clause, only an abrupt discharge or release of pollutants falls within the exception." *Lumbermens Mutual Casualty Co., Inc. v. Belleville Industries, Inc.*, 555 N.E.2d 568, 572, 407 Mass. 675 (1990) [10]; *see Ogden Corp. v. The Travelers Indemnity Co.*, 924 F.2d 39, 42 (2d Cir.1991); *see also Grant–Southern Iron & Metal Co. v. CNA Insurance Co.*, 905 F.2d 954, 956–57 (6th Cir.1990); *FL Aerospace v. Aetna Casualty & Surety Co.*, 897 F.2d 214, 219 (6th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990) (applying Michigan law and concluding: "A sudden and accidental event is one that happens quickly, without warning, and fortuitously or unintentionally."); *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.*, 315 N.C. 688, 340 S.E.2d 374, *reh'g denied,* 316 N.C. 386, 346 S.E.2d 134 (1986); *CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co.*, 759 F.Supp. 966 (D.R.I.1991).[11] To find otherwise would ignore the significance of the "accidental" dimension of the exception, which seems to plainly encompass the unintentional or unexpected nature of the discharge. *Ogden*, 924 F.2d at 42; *Lumbermens Mutual*, 555 N.E.2d at 571; *Outboard Marine*, 1991 WESTLAW 9353, *8 212 Ill.App.3d at 245, 156 Ill.Dec. at 441, 570 N.E.2d at 1163 ("[I]f the term 'sudden' is interpreted as meaning 'unintended and unexpected,' it becomes synonymous with the word 'accidental,' making one of the words nothing more than redundant surplusage."); *see also American Motorists Insurance Co. v. General Host Corp.*, 1991 WESTLAW 35967, *4 (10th Cir. March 21, 1991). Johnson's reading would thus render the word "sudden" superfluous, and is therefore to be avoided. *Peerless Insurance Co. v. Brennon*, 564 A.2d at 385 ("all parts and clauses [of an insurance policy] must be considered together....") (*citing Swift v. Patrons' Androscoggin Mutual Fire Ins. Co.*, 125 Me. 255, 256, 132 A. 745, 746 (1926)).

Moreover, Johnson's argument that Maine would follow the Georgia Supreme Court's construction in *Claussen, supra,* that "sudden" means "unexpected," subjectively defined according to the expectation of the parties, is also implicitly contradicted by the Maine SJC's decision in *Dingwell.*

**10.** In *Lumbermens Mutual*, the Massachusetts Court stated in this context: "We, of course, reject any temptation to let our own ideas of public policy concerning the desirability of insurance coverage for environmental damage guide our legal conclusions." 555 N.E.2d at 571. We agree with the district court, *Johnson*, 741 F.Supp. at 302–03, that Maine would likewise adopt a consciously restrained approach to interpreting the insurance policy. We note that the Maine Court in *Marois* expressly disavowed a desire to spread the high costs of environmental cleanup through the insurance system, stating: "We begin by observing that our role here is simply to determine the meaning of a private contract between these parties, not to foster or retard environmental goals." *Marois*, 573 A.2d at 17. We also bear in mind in this context that Johnson filed this diversity action in federal district court rather than in state court, and cannot expect this court "to torture state law into strange configurations or precipitously to blaze new and unprecedented jurisprudential trails." *Kotler v. American Tobacco Co.*, 926 F.2d 1217, 1224 (1st Cir.1990); *see also Carlton*

*v. Worcester Insurance Co.*, 923 F.2d 1, 3 (1st Cir.1991); *Ryan v. Royal Insurance Co.*, 916 F.2d 731, 744 (1st Cir.1990).

**11.** *But compare contra Claussen v. Aetna Casualty & Surety Co.*, 259 Ga. 333, 335–36, 380 S.E.2d 686, 689 (1989), *answer to certified question conformed to,* 888 F.2d 747 (11th Cir.1989) ("sudden and accidental" means "unexpected and unintended" and noting insurance industry adopted "pollution exclusion" "to exclude only intentional polluters."); *Just v. Land Reclamation, Ltd.*, 155 Wis.2d 737, 760, 456 N.W.2d 570, 574–75 (1990) (noting construction of "sudden and accidental" comports with conclusion that insurance industry's revisions of standard for CGL policy to include pollution exclusion at issue here with intent to exclude only losses caused by expected or intended pollution); *Hybud Equipment Corp. v. Sphere Drake Insurance Co.*, 1991 WESTLAW 11403, *2 (Ohio App. Jan. 30, 1991) (interpreting "sudden and accidental" exception to be a restatement of the limitation in definition of "occurrence" that injury was neither expected nor intended).

In *Dingwell,* the Court distinguished the "sudden and accidental" language of the Chicago Insurance Company and American Policyholders exclusions from the Travelers contract exclusion, which, in place of the "sudden and accidental" language, contained an exception from the pollution exclusion for a discharge neither "expected nor intended from the standpoint of the insured." *Dingwell,* 414 A.2d at 223, 225. The court rejected the Travelers' argument that its language really meant "sudden and accidental." [12] *See also Travelers Insurance Co. v. Waltham Industrial Laboratories, Corp.,* 883 F.2d 1092, 1097–98 (1st Cir.1989). *A fortiori,* the Maine SJC must conclude that "sudden and accidental" does not mean "unexpected and unintended from the standpoint of the insured." We think the Maine Court's statement regarding ambiguity in the meaning of the word "damages" is equally applicable here: "Ambiguity (as opposed to outright lack of understanding) is created only by converting an insured's hope or assumption that every out-of-pocket payment is covered into part of the contract language." *Marois,* 573 A.2d at 19 (footnote omitted).

### III.

Applying the "comparison test," we find that the allegations of facts in the PRP letters exclude coverage under the "pollution exclusion" and the "sudden and accidental" exception to that exclusion. In contrast to the complaint in *Dingwell,* the Maine DEP letter [13] makes clear that pollution and contamination has taken place as a concomitant of the McKin Company's regular business activity in operating the tank cleaning and waste removal business at the McKin site over an extended period of time, rather than as a result of a "sudden and accidental" release. The letter included the following *"Findings of Fact":*

1. Richard Dingwell, doing business as the McKin Company, operated a tank cleaning and waste removal business on a site in Gray, Maine, from approximately 1965 to 1978. The business included the collection, transfer, treatment, storage, and disposal of petroleum wastes and industrial chemical wastes.

4. In 1972, Richard Dingwell d/b/a the McKin Company (hereinafter "McKin") expanded the facility operations with the on-site construction of a lagoon for liquid and semi-liquid wastes and an incinerator to burn wastes....

5. According to business records kept by McKin, more than 300 parties arranged with McKin for the handling, treatment or disposal of petroleum or industrial chemical wastes or both at the Site since 1965.

7. Industrial chemical substances used by some of the persons identified [as responsible parties] in their manufacturing or commercial processes include: 1,1,1–trichloromethane, trichloroethylene, methylene chloride, Freon, xylene, acetone and isopropyl alcohol.

9. The hazardous substances referred to in paragraph 7 were disposed of at the Site and in such a manner that they have been or are being released into the soil and ground water posing a threat to the environment and to the health of the residents of the area.

15. In 1977, the Site, above ground level, contained approximately 22 storage tanks, an asphalt lined lagoon, a sump manhole, a concrete block building, an incinerator and over 200 55–gallon drums. In September 1977, laboratory analyses were performed ... on samples taken from tanks located on the Site. Numerous chemicals including trichloroe-

12. The Maine SJC distinguished the language in the Travelers policy, *supra,* note 5, concluding: [I]t was error to read "sudden and accidental" into the Travelers policy. Unambiguous language in a contract must be given its plain meaning, *Soper v. St. Regis Paper Co.,* Me., 411 A.2d 1004, 1006 (1980). The plain meaning of the Travelers exclusion is that it applies only to "expected or intended" releases of pollutants. A release may be unexpected and unintended, without being sudden and accidental. *Dingwell,* 414 A.2d at 223.

13. The EPA PRP letter did not include specific factual allegations regarding the waste disposal practices and the source of the contamination at the McKin site.

thylene, trichloromethane, xylene, Freon, and acetone were detected in these samples. Analysis of other samples taken at this time ... detected the presence of trichloroethylene and xylene in soil samples taken from the Site. An on-site inspection was performed by EPA on October 11, 1977. Cracked tanks were observed in a leaking condition which released their contents onto the ground. The inspection showed that the ground around the tanks was saturated with fluid. Other areas of the land at the Site were contaminated with waste liquids. 18. In 1979 samples were collected from onsite storage tanks. Analysis of these samples by DEP indicated the presence of trichloroethylene, ethylbenzene, xylene, isopropyl alcohol, acetone, and other organic chemicals. 19. Between March 1984 and June 1984, inclusive, samples from onsite soils and offsite ground water were collected.... Analysis of these samples indicated the presence of trichloroethylene in concentrations in excess of 1000 mg/kg. This analysis also revealed various concentrations of 1,1,1-trichloromethane, dichloroethylene, methylene chloride, tetrachloroethylene, ethyl benzene, xylene, dichlorobenzene, and toluene in on-site soil locations which had formerly been occupied by the storage tanks of the McKin Company. Additional laboratory analyses performed by DEP in 1984 indicated the presence of trichloroethylene in concentrations in excess of 25,000 parts per billion (ppb) and 1,1,1-trichloromethane in concentrations in excess of 450 ppb in ground water within approximately 1,000 feet from the Site.

▪ Though the contamination at the McKin site may not have been expected by Johnson, whose wastes were transported and disposed of there from 1974 to 1976, the discharge in this case was plainly not "sudden and accidental." We are unpersuaded by Johnson's contention that an allegation in the PRP letter—that "[c]racked tanks were observed in a leaking condition which released their contents onto the ground"—could support a finding of a "sudden and accidental" release. This does nothing to contradict the extensive allegations that a variety of disposal methods, including leakage from multiple storage tanks, contributed to the contamination in a course of conduct over a long period of time. Mere speculation under these circumstances that any individual instance of disposal, including leaks, occurred "suddenly" cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a "sudden and accidental" occurrence.[14] *See Industrial Indemnity*

---

**14.** Although not immediately relevant to the duty to defend analysis, subsequent descriptions of the waste disposal operations at the McKin site support the correctness of our conclusion. The United States and Maine complaint, filed in connection with the Consent Decree, alleged that disposal of defendants' hazardous wastes "occurred through use of incineration, surface impoundments, ponds, pits, lagoons, landfills, and direct discharge to the ground" and that releases of "dangerous substances" resulting from these activities have contaminated groundwater. Moreover, the McKin Site Steering Committee (of which Johnson, itself, was a part), in its May 11, 1987 correspondence to PRPs regarding the proposed Consent Decree, discussed the history of the site at some length. The Committee described the activities giving rise to the site's contamination as follows:

The McKin Company operated in Gray between April 1963 and 1977. It was owned by Richard Dingwell. The McKin company largely cleaned oil tanks and oil tankers trucks, although it also apparently performed such services as disposing of chemicals, the unknown contents of 55 gallon barrels, and incinerating debris generated during a large oil spill in 1972. In all, waste from about 350 or more companies, persons, entities and organizations (including federal and state agencies, schools, churches, and nonprofit organizations) was reportedly taken to the McKin site during its years of operation.

Dingwell stored waste brought to the McKin site in large upright and horizontal tanks. Unfortunately, the poor condition of the tanks and the operations of the McKin Company reportedly caused waste oil and other chemicals stored in the tanks to leak into soil and into groundwater beneath the site.

It seems beyond peradventure that the contamination of the site arose due to the continuing waste disposal practices of the McKin Company over a long period of time, and, as a concomitant of its regular business activity, falls squarely within the "pollution exclusion" and was not "sudden and accidental." *See Great Lakes Container*, 727 F.2d at 33; *Ogden*, 924 F.2d at 42. We are also hesitant to speculate that any instance of discharge at the McKin site

*Insurance Co. v. Crown Auto Dealerships,* 731 F.Supp. 1517, 1520–21 (M.D.Fla. 1990) ("These spills and leaks appear to be common place events which occurred in the course of daily business, and therefore cannot, as a matter of law, be classified as 'sudden and accidental.'" (and citing cases)). As we held in a case similar to this:

> In light of the allegations of the complaint, the words of the policy, and the type of activity in which [the polluter] was engaged, we do not think that "a more than casual reading of the policy" by "an ordinary intelligent insured" could result in a reasonable expectation that [the insurer] had a duty to defend [the insured].

*Great Lakes Container,* 727 F.2d at 34 (applying New York law).

*Affirmed. Costs to appellee.*

was "sudden and accidental" since it appears that the insured bears the burden to establish, for purposes of indemnification, that this excep-

tion to the "pollution exclusion" has been satisfied. 19 G. Couch, *Couch on Insurance,* § 79:385 (2d ed. 1983).