K.J. QUINN & CO., INC.

v.

**CONTINENTAL CASUALTY.**

No. C–90–369–L.

United States District Court,
D. New Hampshire.

June 22, 1992.

---

Michael F. Aylward, Morrison, Mahoney & Miller, Boston, Mass., for Continental Casualty.

Richard B. Couser, Orr & Reno, P.A., Concord, N.H., Mary K. Ryan, Nutter, McClennan & Fish, Boston, Mass., for K.J. Quinn & Co., Inc.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

LOUGHLIN, Senior District Judge.

Plaintiff, K.J. Quinn & Co., Inc. ("Quinn"), a corporation organized and existing under the laws of the State of Delaware with principal places of business in Seabrook, New Hampshire and Malden, Massachusetts, filed a complaint in this court on August 3, 1990, against defendant Continental Casualty Company, a corporation organized and existing under the laws of Illinois with a principal place of business in Chicago, Illinois. Continental is an insurance company within an insurance group known as CNA Insurance ("CNA"). Jurisdiction is founded upon 28 U.S.C. § 1332.

Presently before the court are cross motions for summary judgment on the issue of the proper "triggering" of the CNA policies for coverage of Quinn's liability for environmental damage that occurred at a dumpsite in Raymond, New Hampshire. Defendant CNA also moves for summary judgment on the basis of the "pollution

exclusion" provision in the policies issued to Quinn.

## FACTUAL BACKGROUND

Between 1975 and 1983, CNA sold Quinn certain contracts of insurance known as primary level Comprehensive General Liability ("CGL") insurance policies. These policies ran consecutively on a yearly basis from September 1, 1975 to September 1, 1979. Each CGL policy sold by CNA to Quinn contained limits of liability for property damage coverage of $100,000 per occurrence and $100,000 in the aggregate.

This coverage dispute arises out of the disposal of hazardous substances belonging to Quinn. In April of 1979, the State of New Hampshire discovered hazardous substances emanating from partially-buried drums and other containers on a former pig farm owned by Richard Mottolo in Raymond, New Hampshire. The State commenced suit in the New Hampshire Superior Court against Richard Mottolo, Quinn and others alleging that Mottolo had improperly disposed of the hazardous wastes from Quinn's manufacturing facilities.

In the fall of 1980, the United States Environmental Protection Agency ("EPA") removed more than 1,600 55–gallon drums and 5–gallon pails buried at the Mottolo site and placed them in temporary storage on the property. From December, 1981 to February, 1982, EPA transported these containers and contaminated soil from the Mottolo site to off-site disposal facilities.

In September of 1983, the United States of America commenced a civil action (No. 83–547–D) in the United States District Court for the District of New Hampshire against Quinn, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607(a), seeking recovery of response costs incurred at the Mottolo site. The United State's and New Hampshire's CERCLA claims were consolidated in January, 1985. Subsequently, the United States and New Hampshire filed for partial summary judgment against all the defendants and on August 29, 1988, Mottolo and Quinn were found jointly and severally liable for all costs incurred at the Mottolo site consistent with the National Contingency Plan.

Quinn has performed a Remedial Investigation/Feasibility Study ("RI/FS") for the Mottolo site. In 1990, Quinn reached an agreement in principle with the United States and New Hampshire to settle its liability for all response costs incurred by the United States and State of New Hampshire governments up to May, 1990. Quinn remains liable for any response costs incurred at the Mottolo site after May 1, 1990.

In an attempt to deal with the many issues generated by these cross motions, the Court has set forth below the general allegations and responses of the parties. Each will be discussed sequentially in the disposition of this case.

Quinn first asserts that CNA has no defenses to coverage in the policy year(s) in question, since those policies contain an endorsement ("State Provisions") deleting a policy exclusion for pollution. CNA responds that the "State Provisions" endorsement only applies to states in which the policy is issued or delivered. For similar reasons, CNA contends that the 1970 disallowance of the exclusion by the New Hampshire Insurance Commissioner, on which CNA initially relied in accepting coverage for Quinn's liability in this action, is not binding on these Massachusetts policies.

Quinn counters that the exclusion does not apply, because the releases of Quinn's hazardous substances from sealed, metal containers was unexpected and unintended from the standpoint of Quinn and Richard Mottolo, and the release occurred "suddenly" and "accidentally." CNA argues that on-going and deliberate polluting activity by a third party who has been hired by an insured is not "accidental" and that gradual pollution over a period of years is not "sudden."

Quinn also asserts that CNA has waived or is estopped from raising any coverage defenses due to its conduct in handling the Quinn claim for insurance coverage, with particular reference to its statements in

letters to Quinn in 1980 and 1981, and its conduct in undertaking the defense of Quinn in these underlying actions for ten years without issuing a timely or sufficient disclaimer/reservation of rights letter. CNA argues that it never agreed to accept coverage under the pre–1978 policies and has advised its insured of the limitations of its 1978–79 policy since at least 1985. Additionally, CNA disputes Quinn's contention that either waiver or estoppel form a basis for creating coverage where none would otherwise have existed.

Finally, Quinn asserts that coverage is triggered by the express policy terms in each policy year from 1975–1978 due to the release of hazardous substances at the Mottolo site. CNA responds that "property damage" does not occur in cases of this sort until the environmental contamination for which the insured is liable is documented or otherwise becomes manifest.

## DISCUSSION

### A. *Standard for Summary Judgment*

■ Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The "mere existence" of some dispute over factual issues is not sufficient; the disputed facts must be "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute of fact is "material" if it "affects the outcome of the litigation" and is "genuine," if it is manifested by "substantial evidence going beyond the allegation of the complaint." *United States v. Mottolo*, 629 F.Supp. 56, 57 (D.N.H.1984) (citing *Pignons S.A. de Mecanique de Precision v. Polaroid Corporation*, 657 F.2d 482, 486 (1st Cir 1981)). "[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." *Opinion of Justices*, 365 Mass. 681, 313 N.E.2d 561 (1974) (quoting Mass. R.Civ.P. 56(e)).

### B. *Choice of Laws*

As a threshold matter, the Court must determine which state has jurisdiction over this matter and then must apply the governing law of that jurisdiction to the facts of this case. The law of Massachusetts and New Hampshire appears to be identical regarding the interpretation of the policy language which is apposite in this case, thereby making this "choice of laws" issue potentially moot; however, discussion of this issue may help in the resolution of another collateral issue in this case, i.e., the applicability of the "pollution exclusion" in the insurance policies.

During the period in question, Quinn was a Delaware corporation with its headquarters and principal place of business in Malden, Massachusetts. Quinn is now headquartered in Seabrook, New Hampshire. Each of the CNA policies was issued in Boston, Massachusetts and was negotiated through the Boston office of Fred S. James & Company of New England, an insurance agency located in Boston, Massachusetts.

■ Since this diversity action was brought in New Hampshire, New Hampshire's choice of law rule governs. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The New Hampshire Supreme Court has ruled that contract disputes are to be resolved in accordance with the law of the state with "the most significant relationship" to the contract. *New England Merchants Nat'l Bank v. Lost Valley Corp.*, 119 N.H. 254, 256, 400 A.2d 1178 (1979) (citing *Consolidated Mut. Cas. Co. v. Radio Foods Co.*, 108 N.H. 494, 496, 240 A.2d 47 (1968)); *Currier v. Tuck*, 112 N.H. 10, 11, 287 A.2d 625 (1972). In the context of insurance policies, the Supreme Court has consistently ruled that the state with the "most significant relationship" is the one that is the "principal location of the insured risk." *Ellis v. Royal Ins. Co.*, 129 N.H. 326, 331, 530 A.2d 303 (1987) (citing *Radio Foods, supra*, 108 N.H. at 496, 240 A.2d 47). In *Ellis*, the Court applied New Hampshire law to a question of uninsured motorists coverage involving a van that was insured under a fleet policy issued to

Purolator Courier in New Jersey. Since the policy was intended to insure Purolator's operations throughout the country and since the van in question was registered and garaged in New Hampshire, the Court found that it was the intent of the parties that New Hampshire law should apply to any losses involving the van.

■■■ The logic of *Ellis* might result in the application of New Hampshire law here if the pollution had occurred at or resulted entirely from a fixed business risk or operation that was insured by CNA in New Hampshire; however, during the period in question Quinn also operated manufacturing facilities in Malden, Massachusetts, St. Louis, Missouri and Canada. The fact that one of its facilities was located in New Hampshire does not dictate the application of New Hampshire law to this policy any more than would be the case with the law of Missouri or the several provinces of Canada where other Quinn facilities are located. In view of the fact that the policies were negotiated and issued in Massachusetts, it is far more likely that the parties intended the consistent application of Massachusetts law to any controversies arising under these contracts. Absent an express choice of law by the parties, the place where the policy is issued will ordinarily govern. Cf. *Glowski v. Allstate Ins. Co.*, 134 N.H. 196, 589 A.2d 593, 594 (1991).

Defendant CNA states that it was on the basis of *Ellis* that CNA was initially led by certain representations of Fred S. James to conclude that New Hampshire law would apply to the case at bar. In June of 1980, Pamela Haughawout of Fred S. James protested with CNA for not heeding the edict of the New Hampshire Insurance Commissioner disallowing pollution exclusions except in circumstances where a special filing was made with the assent of the policy holder. CNA argues that it was not until facts developed in the course of this coverage case and the underlying CERCLA action were confirmed, that it realized that Massachusetts law was the appropriate law to be applied to the policy in question. (For example, CNA says that it has now confirmed that almost all of the barrels

dumped on Mottolo's property came from Quinn's Malden, Massachusetts headquarters. Only about one-sixth of the waste shipments and total volume of chemicals came from Seabrook. A review of records maintained by Quinn, as supplemented by Mottolo's own work slips, indicates that out of a total of 2,723 drums picked up by Mottolo for disposal between 1975 and 1979, 2,274 of these drums came from Quinn's Malden headquarters; 449 drums came from Quinn's Seabrook facility.) By this time, of course, CNA had already taken on the responsibility of defending Quinn in the underlying action.

## C. *The Pollution Exclusion*

Each of the CNA policies contained an exclusion stating that the policy would not apply "to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*" (Emphasis added.)

There are two prongs to the exclusion. As set forth by the U.S. Court of Appeals for the First Circuit in *Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc.*, 938 F.2d 1423 (1st Cir.1991), the first clause of the exclusion eliminates coverage if the claims against the insured for bodily or property damage arise out of the release or discharge of pollutants. Under the second part of the exclusion, coverage is reinstated if the release or discharge was "sudden and accidental." *Id.* at 1425.

Since it is uncontested that Quinn's liability arises out of the discharge, dispersal, release or escape of pollutants, the only question concerning the application of the exclusion is whether these discharges were both "sudden" and "accidental" so as to reinstate coverage.

The Mottolo Superfund Site, located on Blueberry Hill Road in Raymond, New Hampshire was purchased by Richard Mot-

tolo in 1964 and had been used for a time as a piggery. In 1973, Mottolo acquired Service Pumping and Drain Co., one of whose customers was Quinn. Beginning in 1975, Mottolo began to dump chemical waste that he received from Quinn and another Service Pumping customer, Lewis Chemical, at the Blueberry Hill site. (*U.S. v. Mottolo*, 695 F.Supp. 615, 619 (D.N.H. 1988) and Administrative Order by Consent, Paragraph 6.) Between the summer of 1975 and the spring of 1979, Mottolo transported approximately 1335 barrels and 522 pails of Quinn's wastes to the site.

According to Quinn, Mottolo advised Quinn in 1975 that he was licensed for this work. In fact, Mottolo was not licensed by the State of New Hampshire or any state or local agency in New Hampshire for such dumping. (*Id.* and Mottolo Deposition.)

According to Quinn's plant engineer, Marnin Feldman (who contracted with Mottolo on behalf of Quinn), Mottolo refused to disclose the location where he was taking Quinn's wastes. Mottolo was afraid that disclosure would create "competition." (July 16, 1979 Deposition of Marnin Feldman, page 49.) No employee of Quinn ever went with Mottolo to see where their wastes were being taken. No employee of Quinn ever visited the site prior to May 1979. Quinn had no knowledge prior to 1979 that its wastes had been sent to New Hampshire. *Id.* Quinn states that it repeatedly asked Mottolo where he was taking the waste, but that Mottolo did not disclose this information other than to state that the "disposal site was within fifteen minutes of K.J. Quinn's Malden plant." (Quinn's April 23, 1981 Answer # 5 to States' Second Set of Interrogatories in *State v. Mottolo* and July 16, 1979 Deposition of Marnin Feldman, page 40.)

According to Mottolo, Quinn never asked him where he was taking their drums of waste. Likewise, Mottolo denies having told Feldman that the wastes were being taken to a place within fifteen minutes of Malden. (December 3, 1984 Deposition of Richard Mottolo, page 2–8 and 2–170.) The drums of waste that Mottolo received from Quinn contained multi-colored materials

that looked like shoe polish. (October 31, 1984 Deposition of Richard Mottolo, pp. 10, 25.) Mottolo denies that any employee of Quinn ever told him that the drums contained hazardous materials that required special handling. (*Id.* at 94.) At the time, Mottolo had no experience in handling toxic wastes.

Mottolo disposed of Quinn's drums of wastes at the site by pushing the drums over a slope. Thereafter, Mottolo would use a bulldozer once or twice a year to flatten these piles and to cover them with fill. (June 21, 1979 Deposition of Richard Mottolo, pp. 73–75; December 16, 1983 Deposition of Richard Mottolo, pp. 28–30; Administrative Order by Consent, para. 10.)

The following excerpt is taken from Mottolo's June 21, 1979 Deposition:

Q. All right. Can you explain how you went about dumping the barrels in there and how you proceeded to cover them over and so forth?

A. Yeah. We just—we'd just dump them side by side; and when there was probably ten loads or something like that, we would get a bulldozer in and push them over. Maybe there'd be more. Maybe there'd be 15 loads, and push them over; and then we'd haul a little bit of fill, you know, to put over them. That's basically it.

.   .   .   .   .

Q. Did you observe whether barrels were damaged in the process of doing this leveling off?

A. Here again, by the time I got up there, usually the operator was just about done, and I'd get in on maybe hauling a little fill to put over them. But I know that some of the barrels were broken, yes.

In the Spring of 1979, conditions at the Mottolo site were brought to the attention of the State of New Hampshire. On April 11, 1979, an off-duty local police officer discovered the site while hunting. Representatives of the Bureau of Solid Waste Management visited the site on April 12 and again on April 16. Visual observations and samples taken during these visits confirmed the presence of pollutants. Further

analyses of waste samples taken by Quinn and the State at the site in the spring of 1979 revealed the presence of numerous contaminants, including methyl ethyl ketone, toluene, xylene, butyl acetate, methyl methacrylate, methanol and methyl isobutyl ketone.

State and federal clean-up operations between September 1980 and February 1982 confirmed that "containers at the site had been thrown haphazardly atop each other among boulders, that the majority of the containers were crushed, punctured, corroded and disfigured and that many were leaking. EPA determined that the improper manner of the containers' disposal, the haphazard commingling of chemicals and the accessibility of the site not only created a hazard to ground and surface water, but also posed a risk of fire, explosion, vapor release, and possible inhalation or dermal contact." *U.S. v. Mottolo*, 695 F.Supp. at 619.

In view of the fact that the discharges occurred over an extended period of time and were the result of deliberate dumping activity by Mottolo, CNA asserts that there is no question but that the exclusion should apply and that CNA should be relieved from any policy obligations that might otherwise arise.

The Supreme Judicial Court of Massachusetts has recently had an opportunity to address this issue. In *Liberty Mutual Insurance Company v. SCA Services, Inc. et al.*, (SJC case # 5775, March 26, 1992) the Court discharged the claimed defense obligation of liability insurers in a CERCLA case on the basis of the pollution exclusion. The issue presented in *Liberty Mutual* was the claimed duty of excessive liability insurers to defend a CERCLA action brought against a waste hauler and others by the State of New York. Just as in the instant case regarding the Mottolo site, the government sought a declaration that SCA Services, Inc. was jointly and severally liable along with the site operator for the cost of remediating pollution emanating from a sanitary landfill. Once the drums were received at the landfill, they were disposed of by the site operator, John Cortese. The Amended Complaint alleged that "[w]astes accepted by Cortese were disposed of at the site in trenches dug by him for that purpose. Barrels of waste were dumped into the open trenches and flattened with a bulldozer, or the contents of the barrels were emptied into the trenches and the barrels salvaged for reuse."

SCA's various liability insurers refused to defend SCA in the underlying New York action, citing, among other policy bases, an exclusion in their policies for bodily injury or property damage caused by the discharge, dispersal, release or escape of pollutants, unless said discharge was both "sudden and accidental." A declaratory judgment action ensued in the Suffolk County Superior Court, wherein SCA sought partial summary judgment on its duty to defend SCA in the *State of New York* action. The insurers cross-moved for a declaration that they did not owe coverage for these claims.

On cross-motions for summary judgment, Judge Tuttle of the Superior Court ruled in favor of SCA and entered an order determining that Liberty Mutual, Transportation, and Hartford had a duty to defend SCA in the underlying New York action. Judge Tuttle reasoned that the exclusion did not defeat the claimed duty to defend because:

> [t]he allegations contained in the underlying suit are not restricted to claims of gradual discharges of toxic wastes. The State of New York and the town of Tusten also allege that barrels of waste were dumped and crushed at the Cortese site. If true, these allegations conform to the common-sense understanding of "sudden ..."

The three insurers sought relief in the Appeals Court, with Judge Armstrong of that court allowing them to prosecute immediate appeals from the Superior Court order. The Supreme Judicial Court of Massachusetts transferred the case on its own motion, and on March 26, 1992, reversed the finding and directed the Superior Court to enter summary judgment in favor of the insurers. Writing for the Supreme Judicial Court, Judge Greaney found that:

The pollution alleged in this case was not "sudden," as we defined that term in the *Lumbermens* case. The complaint details routine business activity lasting over several months in which the toxic contents of barrels brought by SCA to the landfill were either emptied into open trenches or dumped into trenches and flattened with a bulldozer. To an ordinary [sic] intelligent person reading the complaint in the New York action, it is evident that the government asserts contamination of the site and the surrounding area and waters due to the continuous waste disposal practices occurring over a protracted period of time as a concomitant part of a regular business activity. Such a situation is within the pollution exclusion because it is not "sudden and accidental."

Opinion at 8.

In *Lumbermen's Mutual Casualty Co. v. Belleville Industries, Inc.*, 938 F.2d 1423 (1st Cir.1991), *cert. den.*, —— U.S. ——, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992), the court noted that the standard to be used in applying the pollution exclusion is not whether individual instances of pollution may have occurred abruptly or unintentionally but whether, taken as a whole, the claims against the insured are based upon a pattern or practice of polluting activity that occurred over an extended period of time.

█ In view of the Supreme Judicial Court's holding in *Liberty Mutual*, it is clear that the disposal of waste drums and other chemicals belonging to Quinn at the Mottolo site over a period of nearly four years was not "sudden and accidental." Just as in *Liberty Mutual*, Quinn's wastes were disposed of pursuant to the routine business operations of a third party, i.e., Richard Mottolo.

The fact that Quinn took no direct or active role in the polluting activity at the Mottolo site is not relevant to the application of the pollution exclusion. *A. Johnson & Co. v. Aetna Cas. & Sur. Co.*, 933 F.2d 66, 74 (1st Cir.1991). As in *Liberty Mutual*, Quinn has failed to meet its burden under Rule 56 of coming forward with any evidence of "sudden and accidental" discharges. Quinn has only speculated that isolated "sudden" events occurred at the site, as when Mottolo bulldozed buried drums or when the tops may have fallen off of drums as they were dumped off the back of Mottolo's truck. Not only were these contentions rejected by the Court in *Liberty Mutual*, but such events can not be viewed as "sudden" when they occur in the course of a third party's regular operations and are part of a routine that persists over a period of months or years. Under the circumstances of the present case, it is clear as a matter of law that the discharges resulting from the intentional and routine dumping and bulldozing by Mottolo of Quinn's toxic wastes were neither "sudden" nor "accidental."

### D.  *Waiver and Estoppel*

█ With regard to Quinn's assertion that CNA has waived or should otherwise be estopped from raising the pollution exclusion as a defense to liability in this action, the Court notes that waiver and estoppel are equitable doctrines designed to prevent an insurer from seeking forfeiture of an insured's rights under a policy, where the policyholder has complied with policy conditions, such as timely notice or the filing of a proof of loss within a certain period of time. However, waiver and estoppel cannot revive expired policies, add insured or properties to the policy, negate policy exclusions, increase policy limits or expand the time period that the policy was in effect. *Johnson v. Liberty Mutual Ins. Co.*, 113 N.H. 8, 300 A.2d 57 (1973); *Farm Bureau Mutual Ins. Co. v. Geer*, 107 N.H. 452, 224 A.2d 580 (1966).

In *Time Oil Company v. CIGNA P & C Ins. Co.*, 743 F.Supp. 1400 (W.D.Wash. 1990), the federal district court ruled that:

As a threshold matter, this court notes that the terms and coverage of a policy may not be expanded through application of the doctrines of waiver and estoppel. Accordingly, Time Oil's claim that defendants waived certain substantive defenses based on coverage and exclusionary clauses are without merit.

*Id.* at 1418.

█ CNA cannot be deemed to have "waived" rights that Quinn never had un-

der the policy. Under the law of Massachusetts and New Hampshire, waiver must be an "intentional relinquishment of a known right." *Trinity Church in Boston v. John Hancock Mut. Life Ins. Co.*, 399 Mass. 43, 502 N.E.2d 532 (1987) (citing *Niagra Fire Ins. Co. v. Lowell Trucking Corp.*, 316 Mass. 652, 657, 56 N.E.2d 28 (1944)) and *A. Perley Fitch Co. v. Continental Ins. Co.*, 99 N.H. 1, 104 A.2d 511 (1954). CNA cannot be deemed to have knowingly waived a defense which, under the law at the time, it did not know that it was entitled to rely on.

■ As regards estoppel, Quinn has failed to establish that it reasonably relied to its detriment on CNA's earlier failure to assert the pollution exclusion as a defense to this claim. *Jimmy's Diner, Inc. v. Liquor Liability Joint Underwriting Association*, 410 Mass. 61, 63, 571 N.E.2d 4 (1991); *American Ins. Co. v. Nationwide Mutual Ins. Co.*, 110 N.H. 192, 196, 270 A.2d 907 (1970).

■ Even if the legal elements of waiver and estoppel could be satisfied, the law is clear that waiver and estoppel cannot serve as a basis for expanding coverage to include risks for which coverage was never intended. *Johnson, supra*, 113 N.H. at 8, 300 A.2d 57; *Geer, supra*, 107 N.H. at 452, 224 A.2d 580; and *Providence Washington Indemnity Co. v. Varella*, 112 F.Supp. 732, 734 (D.Mass.1953).

CONCLUSION

For the reasons stated herein, the Court finds that CNA has no continuing duty to defend or indemnify Quinn in this action. The court finds that the allegations of facts in the record exclude coverage under the "pollution exclusion" and the "sudden and accidental" exception to that exclusion.

However, the Court, in granting defendant's motion for summary judgment, does not suggest that defendants are owed reimbursement for the money that they have expended to date in the defense or indemnification of Quinn in this matter. To allow for such a reimbursement at this time, would be extremely prejudicial and unfair to the plaintiffs. Therefore, defendant

CNA, who has paid the full amount ($100,-000) due under the terms of the 1978–79 policy and the cost of defending Quinn in the underlying action, cannot seek repayment of those amounts. Having found the pollution exclusion in the policy enforceable, the issue of the proper "triggering" of the policies is rendered moot.