INDUSTRIAL INDEMNITY
INSURANCE COMPANY,
et al., Plaintiffs,

v.

CROWN AUTO DEALERSHIPS, INC.,
et al., Defendants.

No. 88-745 Civ-T-10(B).

United States District Court,
M.D. Florida,
Tampa Division.

March 1, 1990.

**1518**

Andrea Z. Evans, Louis Schulman, Butler, Burnette & Pappas, Tampa, Fla., Robert E. Austin, Jr., Austin, Lawrence & Landis, Leesburg, Fla., for plaintiffs.

William F. McGowan, Jr., Carlton Fields Ward Emmanuel Smith & Cutler, Tampa, Fla., John Vance Hughes, Edmund M. Kneisel and Susan A. Cahoon, Kilpatrick & Cody, Atlanta, Ga., for defendants.

## ORDER

HODGES, District Judge.

This is an action for declaratory judgment brought by an insurance company against its insureds who in turn have brought a counterclaim seeking the same relief. The central question is whether plaintiff's insurance policy provides coverage for defendants against claims by environmental authorities arising out of contamination at a hazardous waste site. Before the Court are cross motions for summary judgment (Doc. Nos. 21 & 62).[1] Plaintiff's motion is due to be granted.

## FACTS

Defendants, Dimmitt Chevrolet, Inc. and Larry Dimmitt Cadillac, Inc., operated two automobile dealerships. One by-product of that business was used crankcase oil. From 1974 through 1979, defendants sold this crankcase oil to Peak Oil Company ("Peak") which recycled the oil at its plant in Hillsborough County, Florida for sale as used oil. Peak reprocessed used oil from 1954 until 1979.

In 1983, the Environmental Protection Agency ("EPA") determined that Peak's oil recycling process had resulted in extensive soil and groundwater pollution at and around the plant site (Doc. # 35, Exhibit E, p. 7). The pollution at Peak derived from the company's having placed waste oil sludge in unlined storage ponds. Chemicals from the waste then leached into the soil and groundwater. Pollution also resulted from oil spills and leaks at the site as well as from occasional runoff of contaminated rainwater. *Id.*

In July 1987, EPA notified defendants that a "release of hazardous substances has occurred" at the Peak site and that defendants were potentially responsible parties ("PRP") for EPA's cost of investigating and cleaning up the pollution (Doc. # 63, Exhibit 6, Attachment 1). This liability is imposed on anyone who generates, transports, or disposes of hazardous sub-

---

1. Plaintiff moves to adopt as its own the summary judgment motion of its coplaintiffs, Industrial Indemnity and Federated Mutual. (Doc. # 66). Accordingly, the motion to adopt is GRANTED.

stances pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607. In February 1989, defendants, together with other PRPs, entered into two administrative orders with EPA (Doc. # 35, Exhibits G & H). Though not conceding liability, defendants agreed to undertake remedial measures at the Peak site.

Plaintiff sold comprehensive general liability insurance ("CGL") coverage to defendants during 1972 through 1980.[2] The policy provides coverage to the defendants

> for all sums which the INSURED shall become legally obligated to pay as DAMAGES because of A. BODILY INJURY or B. PROPERTY DAMAGE to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the INSURED seeking DAMAGES on account of such BODILY INJURY or PROPERTY DAMAGE, even if any of the allegations of the suit are groundless ....

An "occurrence" is defined by the policy as

> an accident including continuous or repeated exposure to conditions, which result in BODILY INJURY or PROPERTY DAMAGE neither expected or intended from the standpoint of the INSURED ....

However, the policy excluded coverage for

> BODILY INJURY or PROPERTY DAMAGE arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials ... into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

Though no lawsuit has been filed by the EPA, defendants have demanded that plaintiff both defend them from the EPA's claim and indemnify them for any money they are required to expend in investigating and cleaning up the Peak site.

## LAW

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. The issues urged by the plaintiff in seeking summary judgment are issues of law and contract interpretation. Whether plaintiff must defend and indemnify defendants turns on one or more of the following issues: (a) whether the clean up and investigation costs from the Peak site constitute "damages" under the policy; (b) whether the EPA's notice letter to defendants and/or the consent order qualifies as a "suit" under the policy which would trigger plaintiff's duty to defend; and (c) whether defendants' claim for coverage is precluded by the pollution exclusion clause or may be classified as "sudden and accidental" pollution for which the policy will pay.[3] The strongest argument, and the one on which plaintiff should prevail, concerns whether the pollution exclusion applies and whether the clause is ambiguous. Hence, the Court will assume for purposes of argument that the EPA's notice letter constitutes a suit, that the clean up costs qualify as damages under the policy, and that the EPA's imposition of strict liability is within the scope of the policy's coverage.

Defendants contend that the pollution clause is ambiguous and that under Florida law the ambiguity must be construed in favor of coverage for the insured. *Travelers Ins. Co. v. C.J. Gayfer's Co.*, 366 So.2d 1199 (Fla. 1st DCA 1979). Defendants rely

---

**2.** There is a dispute about the exact period of coverage. Defendants claim that they maintained policies with the plaintiff from 1972–1980 (Doc. # 34, p. 5). Plaintiff, however, claims that it only provided insurance to defendants from 1977 through 1980 (Doc. # 74, p. 2).

**3.** In their opposition to defendants' motion for summary judgment, plaintiff also argues that it is not liable for the strict liability imposed on defendants by the EPA under the CERCLA statute because the CERCLA statute was passed into law subsequent to the policy period and thus was not intended to be within the coverage of the policy.

on several decisions which have found the clause to be ambiguous, and construed it in favor of coverage for the insured. *See e.g., Pepper's Steel & Alloys Inc. v. United States Fidelity & Guaranty Co.*, 668 F.Supp. 1541 (S.D.Fla.1987); *Payne v. United States Fidelity & Guaranty Co.*, 625 F.Supp. 1189 (S.D.Fla.1985);[4] *Claussen v. Aetna Casualty & Surety Co.*, 259 Ga. 333, 380 S.E.2d 686 (1989); *Lansco, Inc. v. Department of Environmental Protection*, 138 N.J.Super. 275, 350 A.2d 520 (Ch.Div.1975), *aff'd* 145 N.J.Super. 433, 368 A.2d 363 (1976). These cases have concluded that the "sudden and accidental" release and discharge of pollutants should be read to mean pollution damage that is merely "unexpected and unintended" from the perspective of the insured. *E.g., Jackson Township Mun. Util. Auth. v. Hartford Accident and Indemn. Co.*, 186 N.J. Super. 156, 451 A.2d 990 (1982). Under this interpretation, argue defendants, plaintiff must defend and indemnify defendants for their liability arising from the contamination at the Peak because it is undisputed that defendants never knew or intended to cause contamination at Peak and, from their perspective, the resulting pollution caused by leaks, spills, and releases was accidental.

Plaintiff contends that the pollution exclusion clause is not ambiguous. Rather, plaintiff, who also relies on substantial precedent, asserts that the clause excludes coverage for all pollution except when the discharge or dispersal of the pollutant occurs abruptly, instantaneously, and accidentally. *See e.g., United States Fidelity & Guaranty Insurance Co. v. Murray Ohio Manufacturing Co.*, 693 F.Supp. 617 (M.D.Tenn.1988), *aff'd* 875 F.2d 868 (6th Cir.1989); *United States Fidelity & Guaranty Co. v. Korman Corp.*, 693 F.Supp. 253 (E.D.Pa.1988); *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.*, 315 N.C. 688, 340 S.E.2d 374 (1986). To that end, plaintiff asserts that it has no duty to defend or indemnify defendants because the pollution at the Peak site was gradual and occurred over a period of several years.

■ The Court agrees with plaintiff, and finds that sudden has a temporal meaning to it as well as a sense of the unexpected. *See C.L. Hauthaway & Sons v. American Motorists Ins.*, 712 F.Supp. 265, 268 (D.Mass.1989) (ordinary and common usage of term "sudden" includes temporal aspect of immediacy, abruptness, swiftness and quickness as well as unexpected).[5] That is, the Court defines "sudden" to mean pollution which occurs abruptly, instantly, or within a very short period of time. An "accident" may be defined as an event which is unexpected or unintended and does not take place within the usual course.

■ The question remains, then, whether the pollution that occurred at the Peak site during the time of coverage was abrupt and accidental. The evidence of contamination at Peak, about which there is no dispute, demonstrates that the pollution occurred gradually and as a normal result of Peak's business operations.

Peak Oil company operated from the mid 50's until it was closed in 1986, and during that time it reprocessed used oil until 1979. Pollution resulted primarily from chemicals from the waste sludge leeching into the soil and aquifer. In addition, other environ-

4. No court in the Middle District has addressed the scope of the pollution exclusion clause. One Court in the Northern District of Florida, *Hayes v. Maryland Casualty Co.*, 688 F.Supp. 1513 (1988), has disagreed with interpretation of the pollution exclusion clause urged in *Payne.*

5. For an excellent discussion of the evolution of the pollution exclusion clause and the history of its interpretation, see, Note, The Pollution Exclusion Clause Through the Looking Glass, 74 Geo.L.J. 1237 (1986). This note criticizes those courts which have interpreted the pollution exclusion clause to mean "unexpected and unin-

tended." It states: "... courts have almost uniformly ignored the insurers' intent and distorted the phrase 'sudden and accidental' beyond recognition." Id. at p. 1240; see also, Abraham, Environmental Liability and The Limits of Insurance, 88 Colum.L.Rev. 942, 963 (1988) (some judicial decisions have emasculated the pollution exclusion); Developments in the Law—Toxic Waste Litigation, 99 Harv.L.Rev. 1458, 1582 (great majority of courts have interpreted "sudden and accidental" quite broadly to include kinds of releases insurers meant clause to exclude).

mental damage also occurred from "accidental spills and leaks of used oil and other substances at the site" and "surface runoff of contaminants from the process area and sludge retention ponds during precipitation events" (Doc. # 35, Exhibit E, p. 3). This pollution damage, therefore, was clearly cumulative, and as of 1985, contaminants were continuing to leach into the ground water (Doc. # 35, Exhibit E, p. 9). Consequently, the leaching and occasional spills of chemicals and runoff from sludge ponds during major rainfalls cannot be classified as abrupt or sudden events. Instead, the severe and long term pollution damage appears to be just the kind of pollution which the pollution exclusion clause was meant to exclude from coverage.

Defendants also argue that at least some of the pollution at Peak was abrupt and accidental such that its liability coverage should be triggered. Adopting the argument of their co-defendants, defendants state:

> there are both allegations in EPA's notices and orders, and facts elsewhere in the record showing that, even accepting [plaintiff's] interpretation of the pollution exclusion, [defendants] would still be covered by the CGL policies. These allegations (which relate to the duty to defend) and facts (which relate to the duty to indemnify) show that the very type of abrupt and immediate accidents that [plaintiff] would concede are covered under the exclusion did periodically occur at the Peak Oil Site.

(Doc. # 35, p. 58). Defendants, however, do not cite any of these allegations. Presumably, defendants are referring to EPA's references to "leaks and spills" of hazardous substances which occurred at Peak. In order to address this argument, the Court will briefly review these allegations.

In 1983, EPA conducted a "Hazardous Waste Site Inspection" of Peak and found "spills everywhere." (Doc. # 35, Exhibit E, p. 7). These spills of oil on the surface were, at least in later years, considered common occurrences (Doc. # 35, Exhibit E, p. 9). To be sure, the operators of Peak did

not intend to deliberately contaminate the site, but an "occasional accident did occur ..." (Doc. # 35, Exhibit D, p. 4). Describing the accidents which occurred at Peak, David Morris, the former vice-president of Peak Oil, stated:

> ... I recall that a number of accidental overflows occurred during the filling of the used oil holding tanks, some of which resulted in fairly large spills.... There were also occasional spills due to leak hose and pipe connections .... Also despite our efforts to impress on our employees the need for safety at all times, occasional carelessness by employees resulted in accidental spills during the transfer of used oil from trucks to storage tanks. I recall a number of accidental spills that occurred when a byproduct of the distillate process was pumped to a storage tank.... Many of these accidental spills and leaks occurred when we were in the rerefining business, prior to 1980.

(Doc. # 35, Exhibit D, p. 5).

These spills and leaks appear to be common place events which occurred in the course of daily business, and therefore cannot, as a matter of law, be classified as "sudden and accidental." That is, these "occasional accidental spills" are recurring events that took place in the usual course of recycling the oil. As one court observed: "contamination ... by disposing of chemicals in the lagoon, or by annual careless spillage onto the ground surface cannot be sudden, or unexpected and accidental ..." *American Mutual Liability Ins. v. Neville Chemical,* 650 F.Supp. 929, 933 (W.D.Pa.1987); *Grant–Southern Iron & Metal Co. v. CNA Insurance Co.,* 669 F.Supp. 798 (E.D.Mich.1986) (polluting air emissions caused by the sporadic or continuous break down of pollution equipment were not sudden and accidental).

A similar issue was considered in *Barmet of Indiana, Inc. v. Security Insurance Group,* 425 N.E.2d 201 (Ind. 1st DCA 1981). In *Barmet,* the insured operated an aluminum recycling plant from which gases occasionally escaped into the atmosphere. These releases were unintentional, and

**1522**

were caused by the "frequent malfunction" of the pollution equipment. On one occasion, the release of gas obscured visibility on the highway, causing a car accident and the death of the driver. The insured argued that the insurer had a duty to defend and indemnify it under its comprehensive general liability policy. The Court found, however, that gas emissions were not "sudden and accidental" instances of pollution because the emissions resulted from the regular malfunctioning of the pollution control system of which the insured was aware.

Like *Barmet*, the spills and leaks at Peak cannot be considered sudden and accidental simply because they were unintended.

Upon due consideration, the Court finds, concludes and declares that the pollution damage at the Peak Oil site is not within the scope of the defendant's CGL policy with the plaintiff.

Accordingly, plaintiff's motion for summary judgment is GRANTED, and defendant's motion for summary judgment is DENIED.

The Clerk is directed to enter judgment for the Plaintiff in accordance with this Order.

IT IS SO ORDERED.