**QUAKER STATE MINIT–LUBE, INC., Plaintiff–Appellant,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, The American Insurance Company, National Surety Corporation, Liberty Mutual Insurance Company, Continental Insurance Company, Unigard Insurance Company, Defendants–Appellees.**

No. 94–4120.

United States Court of Appeals, Tenth Circuit.

April 18, 1995.

Wiley E. Mayne (Steven W. Black with him, on the brief) of Holland and Hart, Denver, CO, for plaintiff-appellant.

Daniel A. Bartoldus of Rivkin, Radler & Kremer, Uniondale, NY, Barbara K. Berrett of Richards Brandt Miller & Nelson, Salt Lake City, UT, (Lawrence A. Levy and Abbe L. Koplitz of Rivkin, Radler & Kremer, Uniondale, NY, Mark J. Williams of Hanson Epperson & Smith, Salt Lake City, UT, Ford G. Scalley and John E. Hansen of Scalley & Reading, Salt Lake City, UT, with them on the brief), for defendants-appellees.

Before SEYMOUR, Chief Judge, ALDISERT,* and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

Plaintiff Quaker State Minit–Lube, Inc. filed this federal diversity action for a declaratory judgment against Defendants Fire-

---

* The Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

man's Fund Insurance Company, American Insurance Company, National Surety Corporation, Liberty Mutual Insurance Company, Continental Insurance Company, and Unigard Insurance Company, seeking a determination that Defendants were obligated to defend and indemnify Plaintiff for environmental clean-up costs. Plaintiff appeals the district court's entry of summary judgment in favor of Defendants. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

The district court set forth the undisputed facts underlying this controversy in *Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278 (D.Utah 1994); we restate, however, the facts relevant to the instant appeal. Plaintiff owns and operates a number of automobile service centers which provide simple vehicle maintenance, including engine oil changes. The service centers drain used engine oil into holding tanks for periodic sale to re-refiners or recyclers. Between 1977 and 1985, Plaintiff sold the used oil to Ekotek, Inc., which operated a facility in Salt Lake City, Utah (the "Ekotek Site") to recycle or re-refine used automobile and industrial oils. Ekotek reprocessed the used oil into lubricating products for resale.

In the ordinary course of business between Plaintiff and Ekotek, Ekotek collected used oil from holding tanks at service centers operated by Plaintiff and transported the used oil to storage tanks at the Ekotek Site for later re-refining. At its site, Ekotek stored approximately 500,000 gallons of liquid containing hazardous substances in sixty above-ground storage tanks ranging from 2,900 gallons to 87,000 gallons, and in 475 drums and 1,500 smaller containers. The Ekotek Site also included three surface impoundments, piles and pits of waste material, underground tanks, and an underground drain field.

Unbeknownst to Plaintiff, prior to 1977 and during the years it conducted business with Ekotek, unknown amounts of used oil and other wastes were released onto the ground at the Ekotek Site, significantly contaminating the soil, surface water, and ground water. The record depicts numerous incidents, accidents, and practices at the Ekotek Site which resulted in discharges of used oil and other contaminants. Two accidents in the loading and unloading of Union Pacific Rail Road cars discharged approximately 12,000 gallons of used oil. The majority of the used oil went underground in a trench designed to collect rainwater runoff from the rail siding. In 1981, between 6,000 and 10,000 gallons of used oil and approximately 700 gallons of motor oil additive were discharged onto the ground during a fire at the Ekotek Site.

Prior to 1967, acid sludge produced in the re-refining process was discharged into a pit at the Ekotek Site, and was not subsequently removed. Beginning in November 1980, acid sludge was dumped directly on the ground in a different large, unlined, earthen pit. Acid sludge would remain in the pit up to a month before it was transported off site. Ekotek continued this cycle of dumping then disposing of acid sludge until at least 1985. Spent clay used in the re-refining process accumulated on the ground at the Ekotek Site before it was periodically hauled away.

Deposition testimony of former refinery employees depicted frequent accidental discharges of used oil and other substances at the Ekotek Site, including tank overflows from operator error, truck spills from driver error, and leaks from faulty equipment. Alex Bloomfield recalled significant tank spills each year he worked at Ekotek between 1978 and 1985. Keith Hitesman testified that waste oil would overflow onto the bare ground during the unloading process, and stated that in 1984 a hose pulled away when unloading, spilling 50 to 100 gallons of used oil. Hitesman also recalled a 2,000 to 3,000 gallon spill during a transfer in the containment area that contaminated the soil. James Blaser stated that in 1985 there was a large spill when a manhole was left off a tank and used oil flowed down the side of the tank and across the ground to the other end of the Ekotek Site. Blaser also recalled two or three incidents when water in the hot oil in tank 52 caused accidental overflows of approximately 500 gallons. Further, Blaser stated that he did not recall any year when there was not an accidental spill or mishap at the Ekotek Site.

Scott Adair recalled runovers in the processing area at the Ekotek Site in 1980 or 1981 that released so much used oil that the spills flowed across the street. Adair remembered overflow incidents once or twice annually between 1978 and 1983 when acid sludge was loaded onto trucks. The spills released approximately 500 to 2,000 gallons of oil and acid mixture on to the ground that flowed down the road. During cold weather, Adair stated that employees transferring sludge from a tank to a truck would go inside to warm up while the sludge drained into the truck. At times, the sludge would overflow "and it would be a river [of acid treated oil] running along that roadway."

Other former Ekotek employees testified that the inferior and outdated equipment used to recycle the used oil persistently discharged contaminants on the Ekotek Site. Plate and frame filters would regularly "squirt oil all over the place" during daily operations. Broken or leaking process equipment was not repaired or replaced unless absolutely necessary. Leaky pumps were a facet of everyday operations.

Plant operators and supervisors stated that the ongoing failure of employees during the period of 1967 to 1988 to keep the site clean contributed to the contamination. Specifically, employees failed to empty buckets of oil, pump oil from catch basins, clean spilled oil, and prevent oil leaks from trucks, pumps, and other machinery.

Employees testified that oily water regularly and routinely ran over from tanks, valves, dump trucks, catch basins, and earthen berms, and leaked onto the bare earth. Back-ups of oily water in the east tank area and in the wrecking yard occurred systematically. Further, frequent oil overflows contaminated the soil in two large retention areas in the northwest portion of the Ekotek Site.

As a consequence of the numerous discharges of pollutants which occurred during the years the Ekotek Site was in operation, the soil, surface water, and groundwater on or near the site became significantly contaminated with oil and other toxic substances. In 1988, the United States Environmental Protection Agency ("EPA") commenced response activities involving the Ekotek Site pursuant to its authority under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9657, amended by Superfund Amendments and Reauthorization Act of 1986, Pub.L. 99–499, 100 Stat. 1613 (1986). The EPA designated the Ekotek Site a CERCLA facility pursuant to 42 U.S.C. § 9601(9) because of contamination by hazardous substances as defined by 42 U.S.C. § 9601(14)(A), and ultimately placed the Ekotek Site on the National Priorities List or "Superfund List." *See* 40 C.F.R. Pt. 300, App. B, at 214 (1994). By February 1992, the EPA had formally identified 470 entities, including Plaintiff, as potentially responsible parties ("PRPs"), and informed the PRPs that they may be liable for response costs[1] incurred during the EPA's cleanup efforts at the Ekotek Site.

Plaintiff, and a number of other businesses identified by the EPA as PRPs under CERCLA, formed the Ekotek Site Remediation Committee, which has funded the cleanup activities at the Ekotek Site pursuant to a consent decree entered with the EPA. As of January 15, 1993, the Committee has expended approximately $10,000,000.00 to cover response costs for the Ekotek Site. Further, the record reflects that total response and clean-up costs for the Ekotek Site may exceed $60,000,000.00.

In order to defray a portion of its liability for the clean-up of the Ekotek Site, Plaintiff sought coverage from Defendant insurance companies that had sold it insurance policies during the years Plaintiff conducted business with Ekotek. Between 1980 and 1986, Plaintiff purchased various comprehensive general liability ("CGL") policies and primary garage

---

1. CERCLA imposes liability for response costs, including removal, remedial, investigatory, and "any other necessary costs" on "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).

liability policies from Defendants. The relevant coverage language in each policy is substantially similar, and obligates Defendants to defend and indemnify Plaintiff for liability claims for damages based on bodily injury or property damage caused by an occurrence. The policies define an occurrence as: "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Each policy also includes a qualified pollution exclusion clause which excludes coverage for:

> [B]odily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(Emphasis added). Simply put, the clause excludes coverage for a pollution discharge which causes bodily injury or property damage unless the discharge is "sudden and accidental."

On March 17, 1992, Plaintiff filed its second amended complaint seeking a declaratory judgment to enforce Defendants' obligations to provide coverage up to the liability limits set forth in each policy and arising from the response costs that had occurred and would occur in connection with the clean up of the Ekotek Site. Plaintiff and Defendants filed cross-motions for summary judgment. Plaintiff sought summary judgment on the grounds it had established, *inter alia,* the basic elements of coverage under the relevant terms of the policies, and that Defendants had failed to show that the pollution exclusion clause excluded coverage. Defendants sought summary judgement on the grounds that they had established, *inter alia,* that coverage was precluded to Plaintiff because the contamination resulted from a repetitive and continuous pattern of polluting activity over a thirty-year period at the Ekotek Site, and thus the discharges did not fall within the "sudden and accidental" exception to the pollution exclusion clause.

On March 21, 1994, the district court, *inter alia,* granted summary judgment for Defendants, finding that they were not obligated to defend or indemnify Plaintiff for the clean-up costs incurred at the Ekotek Site because the pollution exclusion clause barred coverage for the claims at issue. *Quaker State Minit–Lube, Inc.,* 868 F.Supp. at 1332. Specifically, the district court ruled "that the pattern of frequent, even routine occurrences involving the release or discharge of hazardous waste upon or into the ground at the Ekotek Site ... cannot fairly be described as 'sudden and accidental.'" *Id.* at 1329. Because the spills and leaks were common place events which occurred in the ordinary course of daily business at the Ekotek Site, the district court held that the discharges were not, as a matter of law, "sudden and accidental" despite the fact that some individual discharges, considered in isolation, were both sudden and accidental. *Id.* at 1331–32. Consequently, because the discharges did not fall within the "sudden and accidental" exception, the district court ruled that the pollution exclusion clause relieved Defendants of the obligation to defend or indemnify Plaintiff for costs incurred in cleaning up the Ekotek Site. This appeal followed.

On appeal, Plaintiff maintains the district court erred by entering summary judgment in favor of Defendants. Specifically, Plaintiff contends the district court erred by: (1) improperly resolving an issue of material fact by concluding the numerous discrete discharges formed a pattern of discharges that were not "sudden and accidental"; (2) refusing to grant summary judgment in its favor although individual discharges were both "sudden and accidental"; (3) viewing the discharges from the perspective of the polluter rather than the perspective of the insured to determine if the releases were "sudden and accidental"; and (4) relying on policy as opposed to insurance law to grant summary judgment in favor of Defendants.

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district

court." *Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 977 (10th Cir.1995). Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Frandsen*, 46 F.3d at 977. "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Allen v. Minnstar, Inc.*, 8 F.3d 1470, 1476 (10th Cir.1993); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

■ The issue presented in the instant case is narrow: whether the numerous pollution discharges over the years at the Ekotek Site were "sudden and accidental" within the meaning of the exception to the pollution exclusion clause. In a case where jurisdiction is founded on diversity, we apply the law of the forum state. *See Broderick Inv. Co. v. Hartford Accident and Indemnity Co.*, 954 F.2d 601, 606 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 189, 121 L.Ed.2d 133 (1992). To date, the Utah Supreme Court has not addressed this issue of Utah state law. Thus, our duty is to determine, as best we can, how this issue would be resolved by the Utah Supreme Court, *see Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.*, 40 F.3d 146, 150 (7th Cir.1994); *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir.1988), by considering "state court decisions, decisions of other states, federal decisions, and the general weight and trend of authority." *Armijo*, 843 F.2d at 407. "We review de novo the district court's rulings with respect to state law." *Allen*, 8 F.3d at 1476 (citing *Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991)).

In *Hartford Accident & Indem. Co. v. U.S. Fidelity and Guar. Co.*, 962 F.2d 1484 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992), we construed "sudden and accidental" under Utah law "to mean temporally abrupt and unexpected or unintended." *Id.* at 1486. In so doing, we rejected the reasoning of courts that have concluded that the phrase "sudden and accidental" is ambiguous because the term "sudden" functions as a synonym of "accidental." [2]

We think the "annexation" of "sudden" to "accidental" is precisely the issue: reading "sudden" without a temporal component renders "accidental" redundant. While both conditions might include "unexpected" or "unintended," "sudden" cannot

---

**2.** The interpretation of the phrase "sudden and accidental" within the pollution exclusion clause has split the courts. *See St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1200 (1st Cir.1994) (discussing split of authority). Generally, state courts divide on whether the term "sudden" in the phrase "sudden and accidental" is ambiguous because "sudden" arguably means "unexpected" or "unintended," both synonyms of "accidental," in addition to "abrupt" or "quick." Jurisdictions that conclude "sudden" is ambiguous generally interpret the phrase "sudden and accidental" in favor of the insured to mean "unexpected and unintended," but not "abrupt or quick and unexpected or unintended." *See id.* The highest courts of Colorado, Georgia, Illinois, New Jersey, Washington, West Virginia, and Wisconsin have ruled that the term "sudden" is ambiguous when read in conjunction with "accidental," and thus does not mean "abrupt" or "quick." *See Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083 (Colo. 1991); *Claussen v. Aetna Casualty & Sur. Co.*, 259 Ga. 333, 380 S.E.2d 686 (1989); *Outboard Marine Co. v. Liberty Mut. Ins. Corp.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); *Morton Int'l, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); *Queen City Farms, Inc. v. Central National Insurance Co. of Omaha*, 126 Wash.2d 50, 882 P.2d 703 (1994); *Joy Technologies, Inc. v. Liberty Mut. Ins. Co.*, 187 W.Va. 742, 421 S.E.2d 493 (1992); *Just v. Land Reclamation, Ltd.*, 155 Wis.2d 737, 456 N.W.2d 570 (1990). Courts that have concluded "sudden and accidental" means "unexpected and unintended" without reference to a temporal element of "abrupt" or "quick" interpret the pollution exclusion clause in favor of the insured, and conclude that instances of gradual or continuous pollution are "unexpected and unintended," and thereby within the exception to the pollution exclusion clause. *E.g.*, *Queen City Farms*, 882 P.2d at 721, 725; *Hecla Mining Co.*, 811 P.2d at 1092; *see also* Sharon M. Murphy, Note, *The "Sudden and Accidental" Exception to the Pollution Exclusion Clause in Comprehensive General Liability Insurance Policies: The Gordian Knot of Environmental Liability*, 45 Vand.L.Rev. 161, 179 (1992).

mean "gradual," "routine" or "continuous." ... Giving effect to every provision obliges us to construe "sudden" and "accidental" as separate, conditional requirements for coverage.

*Id.* at 1489. Consequently, we ruled that the phrase "sudden and accidental" is unambiguous, and "means abrupt or quick *and* unexpected or unintended in the context of Utah law." *Id.* at 1492. Thus, we concluded that "continuous or routine discharges of pollutants are not covered" within the "sudden and accidental" exception to the pollution exclusion clause because continuous discharges are not temporally abrupt or quick. *Id.* at 1486, 1492.

As we observed in *Hartford,* the lead Utah state case on the issue supported our conclusion that "sudden and accidental" unambiguously means "abrupt and unexpected or unintended." In *Gridley Assocs. v. Transamerica Ins. Co.,* 828 P.2d 524 (Utah Ct.App. 1992), the Utah Court of Appeals ruled that the pollution exclusion exception applied to a series of gasoline discharges caused by a clean break in an underground gasoline line. Noting that it was a case of first impression for a Utah appellate court, the court ruled that the term "sudden" in the phrase "sudden and accidental" has a plain, clear, unambiguous meaning of "immediacy, abruptness, and quickness." *Id.* at 527. Because the clean break in the gasoline line "resulted in an unexpected as well as an immediate and abrupt flow of gasoline from the severed line every time the pump was activated," the court concluded that the discharge was "sudden" under the insurance policy at issue. *Id.* Thus, the Utah Court of Appeals affirmed the entry of summary judgment in favor of the insured.

We revisited the meaning of "sudden and accidental" under Utah law in *Anaconda Minerals Co. v. Stoller Chem. Co.,* 990 F.2d 1175 (10th Cir.1993). In *Anaconda,* we restated that "sudden and accidental" is unambiguous under Utah law, and means "abrupt or instantaneous" and "unexpected or unintended." *Id.* at 1177–78. Thus, we ruled that discharges of flue dust from a fertilizer plant that were continuous and gradual over a number of years were not "sudden and accidental" within the meaning of the insurance policy at issue. *Id.* at 1179.

 Our determination in *Hartford* and *Anaconda* that "sudden and accidental" unambiguously means "abrupt or quick and unexpected or unintended" under Utah law comports with the rulings of many state courts[3] and the majority of federal courts[4] that have faced the issue. Thus, under Utah law continuous, routine, or gradual discharges of pollutants are not "abrupt" or "quick" and thereby not "sudden" within the meaning of "sudden and accidental." *See Anaconda,* 990 F.2d at 1179; *Hartford,* 962 F.2d at 1489, 1492. Other courts have similarly deter-

---

**3.** *See Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.,* 636 So.2d 700 (Fla.1993); *Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc.,* 407 Mass. 675, 555 N.E.2d 568 (1990); *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 476 N.W.2d 392 (1991); *Board of Regents of the University of Minn. v. Royal Ins. Co.,* 517 N.W.2d 888 (Minn.1994); *Waste Management of the Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374 (1986); *Hybud Equip. Corp. v. Sphere Drake Ins. Co.,* 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992), *cert. denied,* — U.S. —, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993).

**4.** *See Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.,* 40 F.3d 146, 153–54 (7th Cir.1994) (Indiana law); *Aeroquip Corp. v. Aetna Casualty and Sur. Co.,* 26 F.3d 893, 894 (9th Cir.1994) (California law); *United States Fidelity & Guar. Co. v. Morrison Grain Co.,* 999 F.2d 489, 493 (10th Cir.1993) (Kansas law); *Aetna Casualty &*

*Sur. Co. v. General Dynamics Corp.,* 968 F.2d 707, 710 (8th Cir.1992) (Missouri law); *Northern Ins. Co. v. Aardvark Assocs., Inc.,* 942 F.2d 189, 193–94 (3d Cir.1991) (Pennsylvania law); *A. Johnson & Co. v. Aetna Casualty & Sur. Co.,* 933 F.2d 66, 72 (1st Cir.1991) (Maine law); *New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1428 (2d Cir.1991) (New York law); *United States Fidelity & Guar. Ins. Co. v. Murray Ohio Mfg. Co.,* 875 F.2d 868 (6th Cir.1989) (construing Tennessee law by affirming district court in memorandum opinion); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.,* 856 F.2d 31, 34–35 (6th Cir.1988) (Kentucky law); *Great Lakes Container Corp. v. National Union Fire Ins. Co.,* 727 F.2d 30, 33–34 (1st Cir.1984) (New Hampshire law). *But see New Castle County v. Hartford Accident & Indem. Co.,* 933 F.2d 1162, 1198–99 (3d Cir. 1991) (Delaware law).

mined that numerous discrete discharges of pollutants during routine business operations form a pattern of discharges that are not "sudden and accidental," and thereby not within the exception to the pollution exclusion clause.[5] Additionally, the fact that individual discharges may have occurred both suddenly and accidentally when viewed in isolation does not alter the conclusion that the overall pattern of discharges was not "sudden and accidental."[6] Simply put, courts should not engage in a microanalysis of discrete discharges which are claimed to be "sudden and accidental" when the discharges otherwise arise as commonplace events which occur in the course of daily business.[7]

The United States District Court for the Middle District of Florida addressed a factual situation similar to the instant case in *Industrial Indem. Ins. Co. v. Crown Auto Dealerships, Inc.*, 731 F.Supp. 1517 (M.D.Fla.1990). In *Crown Auto Dealerships*, the insured, an operator of two automobile dealerships, performed engine oil changes for its customers. Crown Auto sold the used oil to Peak Oil Company, an oil recycler. Unbeknownst to Crown Auto, activities at Peak Oil

Company's recycling facility from the mid-1950's until it closed in 1986 had contaminated the soil and groundwater in the area. Contamination resulted from the storage of used oil in sludge ponds, and "accidental spills and leaks of used oil and other substances at the site," and "surface runoff of contaminants from the process area and sludge retention ponds during precipitation events." *Id.* at 1521. When the EPA identified Crown Auto as a PRP, Crown Auto sought coverage in a declaratory judgment action from the insurance company that had sold it a CGL policy with a pollution exclusion clause identical to the clause at issue in the instant case. *Id.* at 1518–19. The district court first determined that "sudden and accidental" means "abrupt" and "unexpected or unintended" under Florida law. *Id.* at 1520. The district court concluded that because the discharges of pollutants were routine events in Peak Oil's regular business operations, the releases were not "sudden and accidental":

> These spills and leaks appear to be commonplace events which occurred in the course of daily business, and therefore cannot, as a matter of law, be classified as

---

**5.** *See Flanders Elec. Motor Serv.*, 40 F.3d at 154 ("Because these releases of PCBs were commonplace events which occurred in the course of [the insured's] regular business, they cannot be considered sudden and accidental.") (Indiana law); *Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1438 (9th Cir.1993) ("Therefore, under California law, non-sudden, continuous pollution does not qualify as an exception to the pollution exclusion in this case."); *Morrison Grain Co.*, 999 F.2d at 493 (coverage was precluded under Kansas law where "discharge was not sudden and accidental, but a gradual dispersal or release of toxic chemicals or waste materials"); *A. Johnson & Co.*, 933 F.2d at 75 n. 14 ("It seems beyond peradventure that the contamination of the site arose due to the continuing waste disposal practices of the McKin Company over a long period of time, and, as a concomitant of its regular business activity, falls squarely within the 'pollution exclusion' and was not 'sudden and accidental.'") (Maine law); *Star Fire Coals*, 856 F.2d at 35 ("Thus, we believe that such pollution exclusion clauses apply to the release of wastes and pollutants taking place on a regular basis or in the ordinary course of business.") (Kentucky law); *Great Lakes Container*, 727 F.2d at 33 (ruling that discharge was not sudden and accidental under New Hampshire law where pollu-

tion occurred "as a concomitant of [the insured's] regular business activity").

**6.** *See Flanders Elec. Motor Serv.*, 40 F.3d at 154 ("The fact that one or more of these spills or leaks may have occurred suddenly and accidentally does not alter our conclusion."); *Hughes Aircraft Co.*, 22 F.3d at 1438 ("The district court properly rejected Hughes' effort to 'break down its long-term waste practices into temporal components in order to find coverage where the evidence unequivocally demonstrates that the pollution was gradual.' "); *Ray Indus.*, 974 F.2d at 768 (rejecting the insured's argument that each release in an ongoing pattern of releases "was sudden, when viewed in isolation" because "under this theory, *all* releases would be sudden; one can always isolate a specific moment at which pollution actually enters the environment"); *A. Johnson & Co.*, 933 F.2d at 75 ("Mere speculation under these circumstances that any individual instance of disposal, including leaks, occurred 'suddenly' cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a 'sudden and accidental' occurrence.").

**7.** *See, e.g., Ray Indus.*, 974 F.2d at 768; *A. Johnson & Co.*, 933 F.2d at 75.

"sudden and accidental." That is, these "occasional accidental spills" are recurring events that took place in the usual course of recycling the oil.

*Id.* at 1521. Consequently, the district court entered summary judgment in favor of the insurance company, finding that the pollution exclusion clause barred coverage for the contamination at the Peak Oil site. *Id.* at 1522.

On appeal in *Crown Auto,* the Eleventh Circuit certified the issue to the Florida Supreme Court. *Indus. Indem. Ins. Co. v. Crown Auto Dealerships, Inc.,* 935 F.2d 240 (11th Cir.1991). The Florida Supreme Court held that the pollution damage at the Peak Oil site was not within the scope of the CGL insurance coverage. *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.,* 636 So.2d 700 (Fla.1993). In so doing, the court quoted the analysis of the district court and concluded, "[w]ith respect to the pollution which resulted from oil spills and leaks at the site as well as from occasional runoff of contaminated rain water, we agree with the analysis of the federal district judge in this case." *Id.* at 705. Thus, the Florida Supreme Court concluded that the recurring discharges made during the usual course of business at the Peak Oil site did not fall within the ambit of the "sudden and accidental" exception to the pollution exclusion clause. *Id.*

■ The undisputed facts in the instant case compel a similar result. The contamination at the Ekotek Site resulted from years of storage practices and accidents with used oil that released pollutants into the soil, surface water, and groundwater. Based on the record before us, including the deposition testimony of former Ekotek employees, spills, leaks, accidents, and other mishaps with used oil were frequent and familiar occurrences at the Ekotek Site. Because the accidental spills, leaks, and other releases were routine and commonplace events which occurred during regular business operations

at the Ekotek Site, the discharges cannot as a matter of law be considered "sudden and accidental." *E.g., Flanders Elec. Motor Serv.,* 40 F.3d at 154; *A. Johnson & Co.,* 933 F.2d at 75 n. 14; *Crown Auto Dealerships,* 731 F.Supp. at 1521.

Further, the fact that individual discharges viewed in isolation may have occurred suddenly and accidentally does not alter our conclusion that the spills, leaks, and accidents that released used oil at the Ekotek Site were routine events which occurred as a concomitant of regular business operations, and thereby were not "sudden and accidental." *See Flanders Elec. Motor Serv.,* 40 F.3d at 154 ("The fact that one or more of these spills or leaks may have occurred suddenly and accidentally does not alter our conclusion."); *Hughes Aircraft Co.,* 22 F.3d at 1438 ("The district court properly rejected Hughes' effort to 'break down its long-term waste practices into temporal components in order to find coverage where the evidence unequivocally demonstrates that the pollution was gradual.' "). Thus, we reject Plaintiff's argument that the district court should have, seriatim, considered each discharge in isolation to determine whether it was "sudden and accidental." *See Ray Indus.,* 974 F.2d at 768–69 ("[U]nder this theory, *all* releases would be sudden; one can always isolate a specific moment at which pollution actually enters the environment."). We therefore conclude the district court did not err in granting summary judgment against Plaintiff when it determined that based on the undisputed facts the numerous discrete discharges formed a pattern that was not "sudden and accidental." [8]

■ Finally, the district court did not err when it viewed the discharges from the viewpoint of the actual polluter, *i.e.,* Ekotek, as opposed to the viewpoint of Plaintiff to determine if the discharges were "sudden and accidental." The pollution exclusion clause does not require that the insured make the "discharge, dispersal, release or escape" of

---

8. Because we conclude the district court properly entered summary judgment in favor of Defendants based on sound legal principles, we reject Plaintiff's argument that the district court improperly relied on policy considerations in resolving this dispute.

contaminants. Rather, the plain language of the clause excludes coverage for "bodily injury or property damage arising out of the discharge" regardless of whether the insured actively caused or intended the discharge. Thus, "[w]hat the insured intends or foresees is of no consequence." *Morrison Grain Co.,* 999 F.2d at 493; *accord Warwick Dyeing Corp.,* 26 F.3d at 1202 ("We thus see nothing in the policy to indicate that the exclusion is limited to discharges by the insured."); *Aardvark Assocs.,* 942 F.2d at 194. We therefore reject Plaintiff's argument that the district court improperly viewed the discharges at the Ekotek Site from the perspective of the polluter rather than the perspective of the insured when it determined that the releases were not "sudden and accidental."

In sum, we believe the Utah Supreme Court would, if presented with this record, conclude that the recurring spills, leaks, and accidents with used oil at the Ekotek Site were not "abrupt or quick and unexpected or unintended," and thereby not "sudden and accidental" within the meaning of the pollution exclusion clause. Because the contamination of the Ekotek Site was not "sudden and accidental," but resulted from recurring spills and leaks in the usual course of recycling used oil at the Ekotek Site, the pollution exclusion clauses in the insurance policies at issue bar coverage for Plaintiff's property damage claims. Accordingly, we AFFIRM the district court's entry of summary judgment in favor of Defendants.

AFFIRMED.